# No. 25-60068

# IN THE

# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

---

Neumann's Pharmacy, L.L.C.,

Petitioner

v.

Drug Enforcement Administration,

Respondent

**On Petition for Review from**
Drug Enforcement Agency

FN4373293

## BRIEF OF PETITIONER NEUMANN'S PHARMACY, L.L.C.

SUBMITTED BY:

Michael L. DuBos (La. Bar No. 23944)
Adam Karamanis (La. Bar No. 39544)
Breithaupt, DuBos & Wolleson, L.L.C.
1811 Tower Drive
Monroe, LA 71201

William P. Gibbens (La. Bar. No. 27225)
Schonekas, Evans, McGoey, &
McEachin, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, LA 70112

# CERTIFICATE OF INTERESTED PERSONS

No. 25-60068
Neumann's Pharmacy, L.L.C.,
Petitioner

v.

Drug Enforcement Administration,
Respondent

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Respondent: | Counsel for Respondent: |
|---|---|
| Drug Enforcement Administration | Timothy Shea of U.S. Department of Justice Springfield, VA |
| Drug Enforcement Administration | Dayle Elieson of U.S. Department of Justice Springfield, VA |
| Drug Enforcement Administration | Anne Milgram of U.S. Department of Justice Springfield, VA |
| Drug Enforcement Administration | Darlene Tzou of U.S. Department of Justice Springfield, VA |
| Drug Enforcement Administration | Anita Gay of U.S. Department of Justice Washington, DC |

| Petitioner: | Counsel for Petitioner: |
|---|---|
| Neumann's Pharmacy, L.L.C. | Michael L. DuBos of Breithaupt, DuBos & Wolleson, L.L.C. Monroe, LA |
| Neumann's Pharmacy, L.L.C. | Adam Karamanis of Breithaupt, DuBos & Wolleson, L.L.C. Monroe, LA |

| Neumann's Pharmacy, L.L.C. | William Gibbens of Schonekas, Evans, McGoey & McEachin, L.L.C. New Orleans, LA |
|---|---|

<div align="right">

*s/Adam R. Karamanis*
Adam R. Karamanis
Counsel of record for Petitioner
Neumann's Pharmacy, L.L.C.

</div>

## STATEMENT REGARDING ORAL ARGUMENT

Neumann's Pharmacy, L.L.C, requests oral argument. This case raises important questions about unlawful agency actions and agency interpretation and application of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and its implementing regulations. While this case involves an administrative proceeding, the agency's legal interpretations directly bear on the scope of the Act's substantial civil- and criminal-penalty provisions as well. The parties and this Court would benefit from oral argument.

# TABLE OF CONTENTS

**Contents**                                                                        **Page**

CERTIFICATE OF INTERESTED PERSONS ..................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ...............................................v

TABLE OF CONTENTS ................................................................................ vi

TABLE OF AUTHORITIES .................................................................... vii

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE CASE.................................................................2

SUMMARY OF THE ARGUMENT ......................................................15

ARGUMENT .......................................................................................17

CONCLUSION ...................................................................................51

CERTIFICATE OF SERVICE ...............................................................52

CERTIFICATE OF COMPLIANCE.......................................................53

# TABLE OF AUTHORITIES

**Case** **Page(s)**

*Calcutt v. FDIC*,
    598 U.S. 623, 624 (2023) ............................................................... 18, 19

*Chamber of Com. v. SEC*,
    88 F.4th 1115, 1118 (5th Cir. 2023) ...................................................50

*Ciminelli v. United States*,
    598 U.S. 306, 315-16 (2023) ...............................................................32

*Farmacia Yani*,
    80 FR 29053-01, 29062-63 (2015)........................................................23

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754, 766-68 (2011) .......................................................... 23, 24

*Gonzales v. Oregon*
    546 U.S. 243, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) .......................32

*Heavenly Care Pharmacy*,
    85 Fed. Reg. 53,402 (2020) .................................................................45

*Hills Pharmacy, LLC*,
    81 Fed. Reg. 49816, 49835 (2016) ......................................................23

*Holiday CVS, L.L.C.*,
    77 Fed. Reg. 62,316 (2012) .......................................................... 24, 26

*INS v. Orlando Ventura*,
    537 U.S. 12, 16 (2002) ........................................................................50

*Jones Total Health Care Pharmacy, LLC*,
    81 Fed. Reg. 79188, 79190 (2018)......................................................23

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ............................................................................17

# TABLE OF AUTHORITIES
(continued)

*Mathews v. Eldridge*
424 U.S. 319 (1976) ........................................................48

*Morall v. DEA*,
412 F.3d 165, 176-77 (D.C. Cir. 2005) ........................ 17, 43

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29, 43 (1983) ................................................ 18, 45

*Noell v. Bensinger*,
586 F.2d 554, 558 (5th Cir 1978) ....................................17

*Pharmacy Doctors Enterprises Inc., d.b.a. Zion Clinic Pharmacy*,
789 F. App'x 724 (11th Cir. 2019) ............................... 43, 44

*Ruan v. United States*
597 U.S. 450 (2022) ................................................... 30, 31

*Silver Dollar Liquor, Inc. v. Red River Par. Police Jury*,
2010-2776 (La. 9/7/11) ...................................................35

*Suntree Pharmacy & Suntree Med. Equip., LLC*,
85 Fed. Reg. 73753-01, 73769 (2020)...............................23

*Superior Pharmacy I and Superior Pharmacy II*,
81 Fed. Reg. 31310, 31335 (2016)............. 23, 24, 25, 26, 27

*Tewelde v. Louisiana Bd. of Pharmacy*,
2011-2244 (La. App. 1 Cir. 6/14/12), 93 So. 3d 801, 809,
writ denied, 2012-1642 (La. 10/26/12), 99 So. 3d 6522011 ...............33

*Texas v. United States*,
50 F.4th 498, 529 (5th Cir. 2022) ....................................50

*Thryv, Inc. v. NLRB*,
102 F.4th 727, 737 (5th Cir. 2024)...................................17

**TABLE OF AUTHORITIES**
(continued)

*Trinity Pharmacy II,*
    83 Fed. Reg. 7,304, 7,329 (2018) ........................................................22

*United States v. Collier*
    478 F.2d 268 (5th Cir. 1973) ...................................................... 30, 31

*United States v. Hayes,*
    595 F.2d 258, 259 (5th Cir. 1979) ........................................ 21, 22, 33

*United States v. Lee,*
    966 F.3d 310, 324 (5th Cir. 2020) ..................................................23

*United States v. Moore,*
    423 U.S. 122, 141 (1975) .......................................................... 30, 31

*United States v. Ricard,*
    922 F.3d 639, 655–56 (5th Cir. 2019). ...........................................23

**Statutes**

21 U.S.C. § 823 ...........................................................................3, 18, 23

21 U.S.C. § 824 ...........................................................................3, 18, 46

21 U.S.C. § 829 ....................................................................................21

21 U.S.C. § 841 ....................................................................................30

21 U.S.C. § 842 ....................................................................................30

21 U.S.C. § 877 .....................................................................................1

**Other Authorities**

21 C.F.R. § 1306.04 ...................................................................... *passim*

## TABLE OF AUTHORITIES
(continued)

21 C.F.R. § 1306.05 .................................................................................28

21 C.F.R. § 1306.06 ........................................................................ *passim*

21 C.F.R. § 1306.12 .................................................................................28

21 C.F.R. § 1306.13 .................................................................................28

21 C.F.R. § 1316.47……………………………………………………49

Regulations Implementing the Comprehensive Drug Abuse
    Prevention and Control Act of 1970
    36 Fed. Reg. 7,776 (April 24, 1971)……………………………………21

La. Admin Code, tit. 46, Pt. LIII, § 515.........................................34, 35

La. Admin Code tit. 46, Pt. LIII, § 1123.............................................34

La. Admin Code tit. 46, Part LIII, § 2745 .........................................33

La. Admin Code tit. 46, Part LIII, § 2747 .........................................33

La. Admin Code tit. 45, Part XLV, § 7603........................................7, 35

# JURISDICTIONAL STATEMENT

Petitioner, Neumann's Pharmacy, L.L.C., ("Neumann's Pharmacy"), petitions for review of a final order of the Drug Enforcement Administration in the administrative proceeding styled *In the Matter of Neumann's Pharmacy, LLC*, No. 24-1. This Court has jurisdiction under 21 U.S.C. § 877.

# STATEMENT OF THE ISSUES

1. The DEA misinterpreted 21 C.F.R. § 1306.04(a) by imposing liability on Neumann's Pharmacy without finding that it "knowingly" filled actually invalid prescriptions, contrary to the regulation's text, history, and binding precedent.

2. The DEA unlawfully conflated 21 C.F.R. § 1306.06's "usual course of professional practice" standard with violations of state-level standards of care and professional conduct.

3. The DEA misinterpreted provisions of the Louisiana Administrative Code.

4. Neumann's Pharmacy did not unlawfully fill prescriptions written by Dr. T.A. Neumann.

5. The DEA found, without substantial evidence, that Neumann's Pharmacy failed to resolve certain "red flags," by arbitrarily and capriciously treating the absence of documentation of such resolution as conclusive proof that it did not occur, despite no statute, rule or regulation requiring documentation.

6. The DEA's revocation of Neumann's Pharmacy's Certificate of Registration ("COR") was excessive and arbitrary given the minor scope of the alleged infractions, the absence of actual harm, and the sanction's adverse impact on an underserved community.

7. The DEA's created standard of "unequivocal acceptance of responsibility" is arbitrary and capricious and tantamount to a violation of due process.

8. Given the errors committed by the DEA, this matter is ripe for vacatur without remand.

## STATEMENT OF THE CASE

This case challenges the DEA's decision to revoke Neumann's Pharmacy's COR. Neumann's Pharmacy is a small independent pharmacy located in Tallulah, Louisiana, the seat of Madison Parish, a rural agricultural community which has been designated a Medically Underserved Area, with approximately 45% of its population living in poverty.[1]

On September 10, 2023, the DEA issued an Order to Show Cause ("OSC") to Neumann's Pharmacy. The OSC charged that, "from at least March 9, 2020, through March 14, 2022, Neumann's Pharmacy failed to comply with federal and state laws related to controlled substances . . . and engaged in conduct that demonstrates a

---

[1] *See*
https://www.census.gov/quickfacts/fact/table/tallulahcitylouisiana/PST045224;
https://wellaheadla.com/healthcare-access/health-professional-shortage-areas/

negative experience in its dispensing [of] controlled substances." OSC at p. 3, ¶ 4; *see* 21 U.S.C. §§ 823(g)(1)(B), (D); 824(a)(4). These charges were primarily based on allegations that Neumann's Pharmacy "repeatedly filled . . . prescriptions for controlled substances in the face of obvious and unresolved red flags of abuse and diversion," *Id.* at p. 6, ¶ 10, and that it did not "document the resolution of [the] red flag prescriptions [it] filled." *Id.* at ¶ 9.

While not defined in the Controlled Substances Act ("CSA") or any implementing regulation, the term "red flags" is an informal label the DEA has used in administrative decisions to broadly describe various circumstances that may warrant further scrutiny from a pharmacist before a prescription is dispensed. There is nothing close to a comprehensive or authoritative list of "red flags," and the presence of "red flags" does not mean that a prescription is invalid or may not be dispensed. Like "red flag" itself, the process for "resolving" a red flag—the term generally used for when a pharmacist seeks further information to dispel whatever suspicions are created by a "red flag"—is not defined or regulated by any provision of the CSA or regulations.

## I.     The Prescriptions at Issue.

The DEA alleged and ultimately found that Neumann's Pharmacy improperly dispensed prescriptions for four specific customers despite certain "red flags." Most of these prescriptions were written by Dr. T.A. Neumann—one of three practicing

physicians who reside in Tallulah, and the father of Laura Neumann, the owner and pharmacist-in-charge of Neumann's Pharmacy. Transcript at 404-405. The "red flags" that the DEA identified for each specific patient include drug cocktails, therapeutic duplication, cash payments, and prescriptions written to an immediate family member. OSC at pp. 3-6, ¶¶ 4-9.

The term "drug cocktails" refers to combinations of controlled substances that, when taken together, have the potential to cause patient harm, and which have the potential to be diverted or abused. Transcript at p. 118. "Therapeutic duplication" refers to when a patient is taking different drugs of the same class that are indicated for the same issue/symptom. *Id.* at pp. 120, 416. "Cash payments" (more accurately, non-insurance payments) are red flags when the customer has insurance but elects to pay without using insurance, which may indicate that the customer is seeking to avoid scrutiny of the prescriptions by the insurer. *Id.* at p. 383. Finally, prescriptions written by a physician to family members may be a red flag. *Id.* at p. 384.

Notably, however, the presence of any of these red flags does not render a prescription invalid per se. Rather, their presence simply warrants closer scrutiny by the pharmacist. Transcript at pp. 189-190 (Dr. Graham, the Government's expert, agreed that there is no prohibition by the DEA that the subject drugs cannot be dispensed); *id.* at pp. 288-289 (regarding drug cocktails: "It's not an absolute. It is to, when they are in combination, allow that the pharmacist to take pause, review the

information they have, and use their clinical judgment as to the appropriateness of dispensing the medication."); *id.* at pp. 121-122 ( regarding cash payments "…So when patients fill prescriptions with insurance that they reserve paying for their controlled substances with, you know outside of insurance…"); *id.* at p. 286 (pertaining to therapeutic duplication, explaining that a pharmacist is to exercise his or her clinical judgment on a case-by-case basis).

### A.  "Drug Cocktail" Prescriptions for C.E.

For patient C.E., the DEA took issue with prescriptions filled in July 2021, October 2021 and December 2021 for hydrocodone-acetaminophen and clonazepam that were filled within a few days of each other. OSC at p. 4, ¶ 5(a); *see also* Transcript at pp. 289-290; Govt. Ex. 4. The DEA alleges that these prescriptions are considered a "drug cocktail," OSC at p. 4, ¶ 5(a), i.e., a "combination[] of controlled substances that [is] widely known to be abused or diverted, and that significantly increases the risk of serious medical consequences." *Id*. at p. 4.

### B.  "Drug Cocktail" and "Cash Payments" Prescriptions for J.H.R.

For J.H.R., at approximately monthly intervals over 17 months (September 2020-January 2022), Neumann's Pharmacy concurrently filled prescriptions for hydrocodone-acetaminophen and alprazolam (1 mg). Prehearing Ruling at p. 3, ¶ 19; Govt. Ex. 6. The DEA alleged that these prescription combinations also presented a "drug cocktail" red flag. OSC at p. 4, ¶ 5(b). The DEA also claimed that some of

J.H.R.'s controlled-substances prescriptions, for which she paid without insurance, presented an additional red flag, because "[c]ash payments are a common red flag of abuse and diversion." *Id.* at p. 5.

C.    **"Drug Cocktail," "Therapeutic Duplication," and "Cash Payments" Prescriptions for S.W.**

For patient S.W., on eight occasions at approximately three to four-month intervals between May 2020 and December 2021, Neumann's Pharmacy concurrently filled prescriptions for: (1) butalbital-aspirin-caffeine, (2) butalbital-acetaminophen-caffeine, (3) butalbital-aspirin-caffeine with codeine, and (4) diazepam. OSC at pp. 4-5, ¶¶ 5(c), 6(d), 7(b); Govt. Ex. 6.

The DEA claimed that these prescriptions raised three red flags: (1) a "drug cocktail," because of the combination of diazepam with any of the other prescriptions; (2) "therapeutic duplication" (i.e., "multiple controlled substances that have essentially the same effect"), based on the three butalbital-combination medications; and (3) "cash payments," because S.W. paid for the prescriptions without insurance.  OSC at pp. 4-5, ¶¶ 5(c), 6(d), 7(b).

D.    **Dr. Neumann's Prescriptions for Laura Neumann.**

On two occasions, in February 2020 and March 2021, Neumann's Pharmacy filled controlled-substance prescriptions written by Dr. T.A. Neumann for Laura Neumann, his daughter and Neumann's Pharmacy's owner and pharmacist-in-charge. *Id*. at pp. 5-6, ¶ 8; *see also* Transcript at pp. 346-347.  In 2016, the ethical

6

regulations for Louisiana physicians were amended to provide that, other than in emergencies, "physicians shall not prescribe controlled substances for themselves or their immediate family members." La. Admin. Code, tit. 46, pt. XLV, § 7603(A)(11). The regulations deem such prescribing a form of "unprofessional conduct." *Id*. (emphasis omitted). The DEA did not allege that there was any other irregularity with these prescriptions. At the hearing, the Government made clear it was not alleging that filling these prescriptions violated the pharmaceutical "standard of care," "just a direct violation of the Louisiana administrative code [§ 7603(A)(11)]." Transcript at p. 148.

## II.    ALJ Proceedings

A hearing was held before ALJ Teresa Walbaum on April 1 and 2, 2024.  As its first witness, the Government called Theresa Bass, the primary DEA investigator. Agent Bass testified that she began her investigation of Neumann's Pharmacy after receiving a tip that the pharmacist was filling prescriptions for herself. Tr. at 25.

Even though Agent Bass asserted that she sought to determine how Neumann's Pharmacy was handling controlled substances (Transcript at p. 51), Agent Bass did not identify any problems with Neumann's Pharmacy's handling of controlled substances overall. (Transcript at p. 72-73, 76). Rather, Agent Bass focused her investigation on a handful of patients, requested records for these patients, and provided these select records to the DEA's expert witness, Dr. Digi

Graham. Transcript at p. 62. Indeed, Agent Bass' inquiry was so narrow that she did not consider the percentage of controlled substances Neumann's Pharmacy dispensed vs. non-controlled, nor did her investigation consider important demographic considerations, such as the level of poverty in Madison Parish, the general access the population of Madison Parish has to adequate health insurance, and/or whether the amount of cash payments Neumann's Pharmacy processed was comparable to other pharmacies in the area, even though issues with "cash payments" in lieu of insurance was a key allegation levied against Neumann's Pharmacy. Transcript at pp. 53-54, 56-60.

Both the DEA and Neumann's Pharmacy called expert witnesses, Dr. Digi Graham and Dr. Julie Akers, respectively. Both experts offered similar testimony on the role of "red flags" in the context of pharmacy practice, with Dr. Graham vaguely defining a "red flag" as "any little alert that requires you to dig a little deeper and clarify information prior to dispensing," and Dr. Akers defining the term as "things that are deemed cautionary to where a pharmacist should take pause and use their clinical judgment to that patient's file and make a determination if it's appropriate." Transcript at pp. 110, 285.

Dr. Graham testified, without any substantive analysis, and in response to leading questions, that each prescription at issue for C.E., J.H.R., and S.W. was not "issued for a legitimate medical purpose" and that, when Neumann's Pharmacy

filled each prescription, it violated its "corresponding responsibility" to dispense only legitimate prescriptions and "the usual course of the practice of pharmacy" in Louisiana. Transcript at pp. 132, 139-140, 146-147. Dr. Graham based her opinions solely on the above "red flags"—identified from cold pharmacy records, with no other information about the specific patients or their circumstances—and on the lack of documentation of how those abstract "red flags" were resolved. Transcript at p. 118 ("…we document, or it doesn't happen."); *id.* at 191 ("…if it's not documented, it wasn't done."). Because there is no codified requirement to document red flags or their resolution, Dr. Graham relied on what she contended was the standard of care for a pharmacist in Louisiana regarding the documentation of the resolution of red flags. Transcript at p. 118.  Tellingly, Dr. Graham did not evaluate the prescriptions or review the patients' medical records to confirm whether or not the red flags could have or should have been resolved in favor of dispensing the medication as prescribed. Transcript at pp. 189-191. Indeed, Dr. Graham admittedly had "no idea" if Neumann's Pharmacy "spoke to the prescribing physician" and "resolved" concerns about drug combinations. *Id.* at p. 192. She also was admittedly "not aware" whether the "cash payments" customers "had insurance" at the relevant time. *Id.* at p. 200.

As for the issue of cash payments, the ALJ, in her Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision (hereinafter referred to as "ALJ

Opinion"), credits Dr. Graham as testifying that "cash payments can be a red flag on their own," (ALJ Opinion p. 22, n. 25), but an actual reading of Dr. Graham's testimony shows that she testified that cash payments are red flags only when a patient pays in cash when they have insurance available. Transcript at pp. 121-122; *see also* Resp. Exceptions to the ALJ's Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision, pp. 5-6. Regardless, Dr. Akers testified that, even if cash payments, on their own, are red flags, discovering that the patient does not have insurance to otherwise pay for the prescription would resolve that red flag. Transcript at pp. 383-384.

When evaluating C.E.'s drug cocktail red flag, Dr. Akers looked at the prescriptions at issue and C.E.'s patient file as a whole to determine whether the information told a clinically appropriate story. Transcript at p. 290. Dr. Akers noted that the ICD-10 diagnosis code on C.E.'s prescription, M25512, indicated that C.E. was suffering from left shoulder pain.[2] Transcript at pp. 290-292, 293-297. Additionally, C.E.'s file indicated that he was seen by a surgeon who prescribed C.E. medication to manage pain and muscle spasms. Transcript at pp. 290-292. Furthermore, when C.E. returned to his primary care provider, C.E.'s filed indicated

---

[2] Diagnosis codes are set by the National Council for Prescription Drug Products ("NCPDP") which sets professional service and results codes that are used as a standard across all pharmacies. Tr. at 317.

that several non-opioid prescriptions were tried before C.E. was prescribed an opioid. Transcript at pp. 290-292

Dr. Akers explained that, from a clinical standpoint, any time a patient appears to be converting from acute to chronic use of an opioid, a pharmacist would want to see that the patient tried non-opioid medication to manage the pain before switching to an opioid, and C.E.'s file showed that C.E. did just that. Transcript At pp. 290-292, 312-313. Moreover, Ms. Neumann testified that she learned through conversation with C.E. that he suffered from left shoulder pain and that C.E. was being treated for a cervical condition. Transcript at pp. 442-444. Ms. Neumann was not concerned with any risk of overdose when dispensing to C.E, and Dr. Akers opined that nothing in C.E.'s fill history indicated that he was abusing or misusing his prescription medication. Transcript at pp. 305-306, 442-443. Dr. Akers concluded that, based on the information provided, C.E.'s prescriptions were issued for legitimate medical use, and that the information available to Neumann's Pharmacy resolved the drug cocktail red flag and justified filling the medication as prescribed. Transcript at pp. 314-315.

Both S.W. and J.H.R.'s cash payment red flags were resolved as Ms. Neumann was aware that neither patient had insurance. Transcript at pp. 409-410, 456-457, 412-415. As to S.W.—a "childhood friend[]" of Ms. Neumann's—Ms. Neumann was aware that she lived in the U.K. and therefore did not have insurance

for prescriptions filled when visiting the United States. Transcript at pp. 412-415. As to J.H.R., Ms. Neumann testified that she attempted to bill J.H.R.'s insurance for her prescriptions in March 2021, but her insurance was rejected. Transcript at pp. 409-410. J.H.R. then informed Ms. Neumann that she lost her job and no longer had insurance. Transcript at pp. 409-410, 456-457. From that point on, J.H.R. paid for all of her prescriptions in cash. Transcript at p. 410.

When discussing S.W.'s therapeutic duplication red flag, Ms. Neumann testified when faced with that red flag, she called S.W.'s provider and asked why all three butalbital products were being prescribed. Transcript at pp. 418-419. The provider explained that S.W. had been taking these medications for headaches while previously living in California and knew when to take each medication depending on the type of headache she had. *Id*. Additionally, Dr. Akers explained that the body reacts differently to different medications, so by prescribing multiple therapies, patients have greater flexibility with their treatment. Transcript at pp. 369-370. Each butalbital product was prescribed for a roughly 25-day supply. Transcript at pp. 334-335. Dr. Akers noted that S.W.'s fill history indicated that S.W. was filling her prescription every three to four months, indicating that S.W. was alternating therapies as instructed. Transcript at p. 335. Based on this fill history and the quantity of medication supplied, Dr. Akers concluded that the therapeutic duplication red flag

would have been resolved as there was no indication that the medications were being taken at the same time. Transcript at p. 337.

As for J.H.R.'s therapeutic duplication red flag, Dr. Akers noted that a prescription from 2015, depicted in Respondent's Exhibit 6, showed the documentation of the red flag. Transcript at pp. 316-320. Specifically, the prescription showed the NCPDP notations DD, M0 and 1G, which denote that the pharmacist acknowledged the therapeutic duplication, consulted with the prescriber and after consultation with the prescriber, filled the prescription. Transcript at pp. 316-317. Dr. Akers determined that the prescriptions at issue were a continuation of therapy from the 2015 prescription given the ICD-10, or diagnosis code, on the prescription. Transcript at pp. 364-365. Specifically, the diagnosis code, M2660, indicated that J.H.R. was being treated for TMJ, which can be a lifelong and chronic condition. Transcript at pp. 364-365.

Additionally, Ms. Neumann testified that when J.H.R. first started coming to Neumann's Pharmacy, she contacted J.H.R.'s provider to determine why the medications were being prescribed. Transcript at pp. 420, 457. J.H.R.'s provider related that the medications were for chronic TMJ and anxiety, which can cause teeth grinding and worsen TMJ. Transcript at p. 420. Ms. Neumann clarified that the notations found in Respondent's Exhibit 6 were the documentation of the resolution of this red flag. Transcript at pp. 420-422. Notably, Dr. Akers testified that once a

13

red flag is resolved, pharmacists generally will not re-document that resolution if the subsequent prescriptions are a continuation of therapy. Transcript at pp. 325, 379. Considering the information and evidence presented, Dr. Akers testified that there was no evidence of misuse or diversion and that dispensing these prescriptions to J.H.R. was objectively reasonable. Transcript at pp. 331-332.

### III.    DEA Order

The DEA adopted and affirmed the ALJ's recommended decision revoking Neumann's Pharmacy's COR, in an opinion designed to "summariz[e] and clarif[y] portions" of the ALJ's recommended decision. *Neumann's Pharmacy, LLC*, 90 Fed. Reg. 8,039, 8,039 (2025). The DEA found that Neumann's Pharmacy "violated Federal and State law" by dispensing the prescriptions at issue. *Id.* at 8,044.

With respect to the prescriptions for C.E., J.H.R., and S.W., the DEA found that Neumann's Pharmacy did not "properly address[] and resolv[e]" those prescriptions' "clear red flags of abuse and diversion." *Id.* This finding, however, was ultimately based only on the fact that Neumann's Pharmacy did not *document* the resolution of the prescriptions' "red flags"; as the DEA explained its reasoning, "documentation is a critical component of addressing and resolving red flags," such that "failure to document" by itself "invalidates any efforts to resolve the red flags." *Id.* at 8,041, 8,044 n.23. The DEA did not find that the prescriptions were actually invalid, much less that Neumann's knowingly filled any invalid prescriptions.

The DEA further found that revocation of Neumann's pharmacy license was the appropriate sanction in light of what it described as the "egregiousness" of the misconduct and Neumann's Pharmacy's "failure to accept responsibility" unequivocally. *See id.* at 8,044-8,046. At no point did the DEA find that any of the prescriptions at issue were not for legitimate medical purposes or otherwise invalid, were abused or diverted, or caused any harm whatsoever. *See id.* at 8,046 n.27.

## SUMMARY OF THE ARGUMENT

The DEA revoked Neumann's Pharmacy's COR based on fundamental legal errors, unsupported factual findings, and outright refusal to consider arguments against its determined course. This is a clear case of agency overreach that demands correction.

First, the agency fundamentally misinterpreted 21 C.F.R. § 1306.04(a)—addressing the "corresponding responsibility" of pharmacists not to knowingly fill invalid prescriptions—by replacing its explicit scienter requirement with a negligence-like standard and shifting the regulatory focus from invalid prescriptions to artificial bookkeeping standards. The DEA concluded that Neumann's Pharmacy violated federal law even though Neumann's did *not* knowingly fill any invalid prescriptions, simply because it failed to document the resolution of so-called "red flags"—a requirement that appears nowhere in any statute or regulation.

Second, the DEA improperly misconstrued the "usual course of professional practice" under 21 C.F.R. § 1306.06, equating it with a mere negligence standard involving failure to meet a general standard of care. That glaring error mistakenly conflates professional negligence with criminal violations of the CSA, wrongly federalizing state-law professional standards.

Third, the DEA incorrectly interpreted and applied provisions of the Louisiana Administrative Code.

Fourth, the DEA's findings that Neumann's Pharmacy failed to resolve red flags are unsupported by substantial evidence. The record shows that Neumann's Pharmacy acted in good faith, applied professional judgment, and had sound, patient-specific grounds to dispense the prescriptions at issue. The DEA did not actually find—as a factual matter—that the facts were otherwise. Instead, it arbitrarily invented a *legal* rule treating the lack of documentation as conclusive evidence of wrongdoing, even though no law imposes a duty to document such resolutions.

Fifth, the sanction of revocation of Neumann's Pharmacy's COR was arbitrary and disproportionate, particularly given the absence of any evidence of diversion, harm, or actual violations of law. The DEA further acted arbitrarily and capriciously and violated Neumann's Pharmacy's due process rights by punishing it for failing to "unequivocally accept responsibility"—in other words, for contesting

16

legal and factual issues during a hearing to which it was entitled by law. And the DEA unjustifiably refused to consider the impact of revocation on the surrounding community, which cannot be divorced from the ultimate question of whether the public interest demands revoking Neumann's Pharmacy's COR based on violations of DEA-invented prophylactic recordkeeping requirements.

# ARGUMENT

## I.    Standard of Review

DEA revocation orders are reviewed under the same standards as other agency orders under the Administrative Procedure Act. *Morall v. DEA*, 412 F.3d 165, 176-77 (D.C. Cir. 2005); *Noell v. Bensinger*, 586 F.2d 554, 558 (5th Cir 1978).  This Court reviews questions of law *de novo*. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).  It "review[s] the [agency's] findings of fact for substantial evidence," "uphold[ing] [them] only if they are supported by evidence that is substantial when viewed in light of the record as a whole, including whatever in the record fairly detracts from its weight." *Thryv, Inc. v. NLRB*, 102 F.4th 727, 737 (5th Cir. 2024) (cleaned up).

Agency "reasoning[,] as distinguished from its factfinding," is reviewed for whether it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Morall*, 412 F.3d at 177.  It is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Reviewing courts must judge the propriety of agency action solely by the grounds invoked by the agency." *Calcutt v. FDIC*, 598 U.S. 623, 624 (2023) (*per curiam*) (alteration adopted).

## II. The DEA Applied Erroneous Interpretations of Relevant "Federal and State Law."

The DEA's central conclusion that Neumann's Pharmacy "violated Federal and State law" was premised on a legally erroneous reading of those laws. *Neumann's Pharmacy*, 90 Fed. Reg. at 8,044. As a statutory matter, the DEA's ultimate conclusion was that Neumann's Pharmacy's "continued registration is inconsistent with the public interest" under 21 U.S.C. § 824(a)(4). *Id*. The DEA found that the Government's evidence was limited to factors B and D under 21 U.S.C. 823(g)(1). *Neumann's Pharmacy*, 90 Fed. Reg. at 8,043-8,044. But factor B was wholly subordinate to factor D, *see* ALJ Op. at 28 (considering them together), and, indeed, the DEA's final order scarcely mentioned factor B, resting its analysis on the finding that "the  Government established a *prima facie* case that the Respondent violated federal and state law." *Neumann's Pharmacy*, 90 Fed. Reg. at

8,044. Accordingly, that legal issue is the essential ground on which this Court's review must focus. *Calcutt*, 598 U.S. at 624.

The DEA primarily determined that Neumann's filling the prescriptions for C.E., J.H.R., and S.W. violated the CSA because Neumann's supposedly did not "resolve" or "document" "red flags," which the DEA found violates 21 C.F.R. §§ 1306.04 and 1306.06. *Neumann's Pharmacy*, 90 Fed. Reg. at 8,041-8,044. But that determination rests on a clear error of law. Neither provision of the CSA says anything about resolving or document red flags.

First, Section 1306.04(a) prohibits a pharmacist from **knowingly** filling an **invalid** prescription. But the DEA did not even purport to find that any of the prescriptions at issue were actually invalid, much less that Neumann's Pharmacy knowingly filled any invalid prescriptions.

Second, § 1306.06 also says nothing about documenting or resolving red flags. It requires pharmacists to act in "the usual course of professional practice," but that simply requires acting *as a professional*, instead of acting in a manner alien to the profession of pharmacy—such as acting as a drug pusher. Accordingly, this provision does not impose any requirement for resolving or documenting any red flags at all.

For both of these reasons, the DEA's central finding, that Neumann's Pharmacy committed "repeated violations of Federal … law," *Neumann's Pharmacy*, 90 Fed. Reg. at 8,044, was wrong as a matter of law.

As for the alleged "violations of … State law," *id.*, the independent significance of state law was minimal. The DEA did not find that Neumann's Pharmacy violated any distinct state-law duty, with the exception of a regulation for *physicians* that does not apply to pharmacists.

### A.    The DEA Misconstrued 21 C.F.R. § 1306.04(a).

The DEA's first and most crucial error is its erroneous interpretation and application of 21 C.F.R. § 1306.04(a), which defines the requirements of a valid controlled-substance prescription and also forbids pharmacists from *knowingly* filling *invalid* ones. To find that Neumann's Pharmacy violated that prohibition, the DEA improperly disregarded the invalidity and scienter requirements in 21 C.F.R. § 1306.04(a), and premised its findings on a lesser negligence-type standard focused on wholly abstract "red flags."

The text of 1306.04(a) first addresses the scope of a provider's prescribing authority, providing that, "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." The remainder of subsection (a) provides:

> The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person **knowingly** filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances. (Emphasis added).

The text of this regulation is clear: pharmacists must not "**knowingly**" fill an invalid prescription, which would be one not issued for a legitimate medical purpose by a doctor acting in the usual course of his professional practice. *See* 21 C.F.R. § 1306.04(a) (emphasis added).

The history of 21 C.F.R. § 1306.04(a) makes clear that the scienter requirement is a crucial component of the regulation, acknowledging that pharmacists are not medical practitioners who must second-guess prescriptions that are facially valid. Indeed, regulators "revis[ed] the original language 'to require knowledge,' so pharmacists would not have "the responsibility . . . to determine the legitimacy of a prescription." Regulations Implementing the Comprehensive Drug Abuse Prevention and Control Act of 1970, 36 Fed. Reg. 7776, 7777 (Apr. 24, 1971).

In keeping with that clear history, this Court has acknowledged the scienter requirement for pharmacist liability under 21 C.F.R. § 1306.04(a). In *United States*

*v. Hayes*, 595 F.2d 258, 259 (5ᵗʰ Cir. 1979), a registered pharmacist was convicted of one count of conspiracy to distribute controlled substances, in violation of § 1306.04(a). In addressing that provision, this Court concluded, "…a pharmacist may not fill a written order from a practitioner, appearing on its face to be a prescription, **if he knows** the practitioner issued it in other than the usual course of medical treatment." *Id.* at 260 (Emphasis added).

This Court also expressly acknowledged that a pharmacist's obligations under the "corresponding responsibility" set forth in 21 C.F.R. § 1306.04(a) does not require a pharmacist to usurp the role of the physician, as "[t]he pharmacist is not required to have a 'corresponding responsibility' to practice medicine..." *Id.* at 261. The Court further explained "[w]hat is required of him is that the responsibility not to fill an order that purports to be a prescription but is not a prescription within the meaning of the statute **because he knows** that the issuing practitioner issued it outside the scope of medical practice." *Id*. In short, § 1306.04(a) means exactly what it says, and it was on that ground that this Court upheld it against a constitutional vagueness challenge in *Hayes*. *See* 595 F.2d at 260-261 & n.6.

The DEA has previously agreed with this principle, noting that, "to prove a violation of a pharmacist's corresponding responsibility, the Government must show that the pharmacist acted with the requisite degree of scienter, i.e., that the pharmacist 'knowingly' filled [an illegitimate] prescription." *Trinity Pharmacy II*,

83 Fed. Reg. 7,304, 7,329 (2018) (citing *JM Pharmacy Grp., Inc., d/b/a Farmacia Neuva & Best Pharma Corp.*, 80 Fed. Reg. 28667, 28669 (2015)).[3] Although courts and the DEA have held that the scienter requirement may also be satisfied by willful blindness—because the law generally treats willful blindness as equivalent to actual knowledge, *see Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766-68 (2011)—that is still a subjective scienter standard, requiring "(1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct." *United States v. Lee*, 966 F.3d 310, 324 (5th Cir. 2020); *United States v. Ricard*, 922 F.3d 639, 655–56 (5th Cir. 2019).[4]

As to the relevance of "red flags" in this inquiry, the DEA's decision in *Superior Pharmacy* is instructive.   There, as here, the Government charged a pharmacy with violating § 1306.04(a)  to establish grounds for revocation under § 823(g)(1)(B) and (D).  81 Fed. Reg. 31,310, 31,334 (2016). But, because there was

---

[3] *See also, e.g.*, *Suntree Pharmacy & Suntree Med. Equip., LLC*, 85 Fed. Reg. 73753-01, 73769 (2020); *Jones Total Health Care Pharmacy, LLC*, 81 Fed. Reg. 79188, 79190 (2018); *Hills Pharmacy, LLC*, 81 Fed. Reg. 49816, 49835 (2016); *Superior Pharmacy I and Superior Pharmacy II*, 81 Fed. Reg. 31310, 31335 (2016); *Farmacia Yani*, 80 FR 29053-01, 29062-63 (2015).

[4] This Court has cautioned, in the criminal context, that the "willful blindness, conscious avoidance," "ostrich," or "deliberate indifference" theory of knowledge standard must be "sparingly" applied due to its inclination to reduce the *mens rea* of knowledge to a negligence standard, allowing convictions for mere "negligence or stupidity." *Lee*, 966 F.3d at 324; *Richard*, 922 F.3d at 655-56.

no proof of actual knowledge or willful blindness as to the invalidity of the prescriptions, the DEA did not find a violation of § 1306.04(a). *Id.* at 31,335.

In *Superior*, the Government cited to the DEA's decision in *Holiday CVS, L.L.C.,* 77 Fed. Reg. 62,316 (2012), and argued, just as it does here, that the pharmacy in *Superior* violated § 1306.04(a) simply because it filled prescriptions "which presented various 'red flags' which were never resolved." *Id.*at 31,335. Also, just as it does here, the Government in *Superior* argued that there was no evidence that the red flags had been resolved before the medications were dispensed. *Id.* But the DEA was clear that simply pointing out red flags, even unresolved ones, was not enough to satisfy the scienter requirement:

> All red flags do not have the same hue, and as the Supreme Court's decision in *Global-Tech* makes plain, proof that a pharmacist dispensed a controlled substance prescription without resolving a red flag which only created a "reasonable suspicion" that the prescription lacked a legitimate medical purpose, is not enough to establish that a pharmacist acted with the requisite scienter. However, where there are multiple red flags, none of which alone would establish the requisite scienter, the combination of red flags may well create a subjective belief that there is a high probability that a prescription lacks a legitimate medical purpose.

*Id*. at 31,335 n.54.

In *Holiday CVS*, by contrast, the prescriptions were "so obvious[ly]" invalid, with such numerous and extreme red flags, "that only those who are *deliberately ignorant* would fill" them. *Holiday CVS*, 77 Fed. Reg. at 62,322 (emphasis added);

*see also, e.g.*, *id.* at 62322 at nn. 25-26. In that case, both the invalidity of the prescriptions and the pharmacists' scienter were sufficiently (if circumstantially) proven, allowing a finding that § 1306.04(a) had been violated.

Here, the Government did not show and the DEA did not find: (1) that any of the prescriptions at issue were invalidly written; (2) that the red flags were so extreme that they must have been invalid; (3) that Neumann's Pharmacy knew that they were invalid; or (4) that Neumann's Pharmacy was willfully blind, i.e., that it "subjectively believe[d] that there [was] a high probability that" the prescriptions were invalid and "[took] deliberate actions to avoid learning of that fact." *Superior Pharmacy*, 81 Fed. Reg. at 31,335 (quoting *JM Pharmacy Group, Inc., d/b/a Farmacia Nueva and Best Pharma Corp.*, 80 Fed. Reg. 28,667, 28,672 (2015)). There was simply no evidence, and no finding, on *any* of these facts. Indeed, the issues of invalidity and actual knowledge were expressly disclaimed as irrelevant. *See Neumann's Pharmacy*, 90 Fed. Reg. at 8,047 (stating "the Government need not prove that the prescriptions were not *issued* for a legitimate medical purpose"); ALJ Opinion at 31 ("In this case, the Government did not allege that Respondent dispensed prescriptions with actual knowledge that [they] lacked a legitimate medical purpose.").[5] There was also no finding of willful blindness. (Nor could there

_____

[5] Although, on direct examination, Dr. Graham pronounced completely conclusory opinions—with no insight into the patients' medical circumstances—that the prescriptions for C.E., J.H.R., and S.W. were not issued for legitimate medical purposes (Transcript at pp. 132, 140, 146), the

have been, as the unrebutted facts in the record established that there was sufficient justification for Neumann's Pharmacy to resolve the red flags in favor of dispensing the medications as prescribed. *Infra* III.)

In short, and in direct conflict with its own decision in *Superior*, the DEA found that Neumann's Pharmacy violated § 1306.04(a) without making any finding whatsoever of either invalidity or scienter.

Instead, the DEA mechanically applied the same distorted *Holiday CVS* standard which *Superior* rejected: § 1306.04(a) is violated whenever: (1) a pharmacist "dispensed a controlled substance, (2) a red flag was *or should have been* recognized … , and (3) the question created by the red flag was not resolved conclusively" before dispensing. *See Neumann's Pharmacy, LLC*, 90 Fed. Reg. at 8047 n.29 (emphasis added); *see also* ALJ Opinion pp. 29-31. This wooden test is an incorrect interpretation of § 1306.04(a).

First, it wholly replaces the regulation's clear scienter requirement with at best one of mere negligence, applying an objective, should-have-known standard to the

---

ALJ interpreted that testimony as relating solely to the pharmacist's purported "corresponding responsibility" to resolve resolution of the prescriptions' abstract "red flags." ALJ Opinion at 7-8 n.10. Of course, Dr. Graham also opined that Neumann's Pharmacy did not resolve the "red flags"—solely based on the lack of documentation, with no insight (or curiosity) regarding what Neumann's Pharmacy actually knew about the patients and their circumstances. While the DEA order and the ALJ opinion make much of Dr. Graham's supposedly "credible" expert opinions, the reality is that her opinions were little more than legal conclusions reached under the DEA's erroneous, mechanical legal framework.

duty to recognize and then resolve each "red flag."[6]  Second, by fixating on "red flags" alone—especially in the abstract, without any regard to their particular "hue," *Superior Pharmacy*, 81 Fed. Reg. at 31,335 n.54—it turns a blind eye to whether or not a controlled substance has been lawfully prescribed, although § 1306.04(a) clearly provides that, in order for a pharmacist to be liable, he or she must (1) fill an *invalid* prescription (2) with the requisite scienter. In other words, the standard applied here distorted *both* the *mens rea and* the *actus reus* of § 1306.04(a)— completely transforming the liability standard.

Further, the very concepts of "red flags" and their "resolution" are far too indeterminate for a rigid legal standard, divorced from the specific facts of a particular case and evaluated without adherence to the scienter requirement to find a violation of § 1306.04(a).  In broad, general terms, a "red flag" is just something that does or could arouse suspicion in a given context; "resolution" is whatever resolves the suspicion for that red flag in that context. These are not hard-and-fast legal concepts, but shorthand terms for a sliding scale of discomfort that does not exist in the abstract.

Moreover, the DEA cannot point to any statutory or other legal requirement, other than its own self-created standard, that requires a pharmacist to not only

---

[6] The DEA further erroneously treated failing to *document* the resolution of a red flag as conclusive proof of failing to *resolve* the red flag at all, divorcing the standard even further from the text of § 1306.04(a) and effectively creating a *strict liability* standard as to documentation failures.

resolve red flags, but to also document them as well.[7] By contrast, when the DEA has imposed a documentation or record-keeping requirement, it has promulgated rules which specifically set forth the requirement to document and the specific information that must be documented.  For example, 21 C.F.R. § 1306.05 sets forth the requirements for the issuance of prescriptions for controlled substances, which includes the following express documentation requirements:

> (a) All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner.

Likewise, 21 C.F.R. § 1306.12 sets forth the requirements for issuing multiple prescriptions of Schedule II controlled substances, which instructs the practitioner to provide "written instructions on each prescription…indicating the earliest date on which a pharmacy may fill each prescription[.]"[8]

Another example is 21 C.F.R. § 1306.13, which provides documentation requirements for the partial filling of prescriptions for controlled substances, and provides, in pertinent part:

---

[7] To this point, the DEA cannot point to any published statute, rule or regulation that governs when documentation is required and what must be documented to pass its elusive, self-created standard.
[8] 21 C.F.R. 1306.12

(a) The partial filling of a prescription for a controlled substance listed in Schedule II is permissible if the pharmacist is unable to supply the full quantity called for in a written or emergency oral prescription and he makes a notation of the quantity supplied on the face of the written prescription, written record of the emergency oral prescription, or in the electronic prescription record.

Thus, when the DEA requires documentation as a requisite for compliance, it has promulgated specific rules which expressly state (1) what triggers the requirement to document and (2) what information must be documented. Yet, the DEA has not promulgated any rule on what "red flags" trigger a requirement to document or what must be documented for compliance.

## B.     The DEA Misconstrued 21 C.F.R. § 1306.06.

The DEA also misconstrued § 1306.06 when it concluded that Neumann's Pharmacy's dispensing was "outside the usual course of professional practice" because it allegedly "fell below the Louisiana standard of care" for pharmacy practice. *Neumann's Pharmacy*, 90 Fed. Reg. at 8,044. This is clearly wrong as a matter of law, as it would convert professional negligence into criminal conduct.

The "usual course of professional practice" is a key concept in the CSA, as it delineates the scope of lawful prescribing and dispensing for both physicians and pharmacists. A prescription is not valid unless a registered prescriber "issued" it "for

a legitimate medical purpose . . . in the usual course of his professional practice." §
1306.04(a). A pharmacist may only fill a prescription for a controlled substance
when "acting in the usual course of his professional practice." § 1306.06. Prescribing
or dispensing outside the usual course of professional practice exposes registrants to
a civil penalty of up to $25,000 *per violation*, *see* 21 U.S.C. § 842(a)(1), (c)(1)(A),
and potentially to criminal penalties as well, § 841(a)(1).

The CSA does not impose such penalties for every failure to comply with
"best practices" or any generic professional standard. Rather, as Justice Alito's
concurrence explained in *Ruan v. United States*, "to act 'in the course of professional
practice'" simply means to engage in the *bona fide* practice of that profession. 597
U.S. 450, 479 (2022) (concurring in the judgment) (quoting *United States v. Moore*,
423 U.S. 122, 141 (1975)). Even a physician "who makes negligent or even reckless
mistakes" can be said to still be "acting as a doctor," though he or she may be "acting
as a *bad doctor*." *Id.* The corollary is also true for a pharmacy, i.e., a pharmacy acts
in the course of professional practice when it engages in the practice of pharmacy.
And a pharmacist who is negligent or perhaps even reckless in filling a prescription
is still acting as a pharmacist.

This Court has applied the same interpretation of "usual course of professional
practice." In *United States v. Collier*, a physician was charged with six counts of
dispensing a controlled substance outside the usual course of his professional

practice. 478 F.2d 268, 270 (5th Cir. 1973). Recognizing that a physician is expected to prescribe "in the bona fide treatment of a patient's disease," this Court noted that "'[w]hat constitutes *bona fide* medical practice must be determined upon consideration of evidence and attending circumstances.'" *Id.* at 272 (quoting *Linder v. United States*, 478 U.S. 5, 18 (1925)). A physician acts outside the course of professional practice when he or she is not prescribing drugs for medical reasons but instead "acts, in essence, as a 'pusher.'" *Id.* at 274. Again, this same standard applies to pharmacists. Thus, a pharmacist is not acting outside the usual course of professional practice unless she is no longer acting as a pharmacist dispensing medication on a good-faith basis, but instead has become a drug pusher or otherwise pursues "[o]bjectives. . . alien" to the profession. *Ruan*, 597 U.S. at 479 (Alito, J., concurring in judgment); *see also Collier*, 478 F.2d at 272, 274; *Moore*, 423 U.S. at 141-143.

The DEA's equating "the usual course of professional practice" with a general "standard of care" or "best practice" standard would erase the crucial distinction between malpractice and a criminal act which abandons the practice of pharmacy or medicine entirely. As noted above, as Justice Alito explained in *Ruan*, it is entirely possible for a doctor to act in subjective good faith and still be a bad doctor, so long as the individual is acting for a medical purpose, i.e., to "prevent, cure or alleviate the symptoms of a disease or injury." 597 U.S. at 479. Simply put, there is, and the

law recognizes, a profound difference between a pharmacist or physician acting in good faith to prescribe/dispense medication to treat a disease or injury, and a doctor or pharmacist who has become little more than a "pusher" and is knowingly or purposefully issuing or filling prescriptions to "facilitate addiction and recreational abuse." *Id.* (quoting *Gonzales v. Oregon*, 546 U.S. 243, 274, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006)).

If the "usual course" requirement were converted into a professional standard of care, then the DEA would become responsible for regulating professional pharmacy standards in a way that would "place under federal superintendence a vast array of conduct traditionally policed by the States." *Ciminelli v. United States*, 598 U.S. 306, 315-16 (2023). The CSA presumes that regulating professional conduct is generally a matter for the States. *See Gonzales v. Oregon*, 546 U.S. 243, 250-52 (2006). It should not be read to impose federal penalties every time a registrant falls short of some state-imposed professional standard. Moreover, it would effectively allow the federal government to punish physicians and pharmacists for failing to adhere to a professional standard that has only arisen due to the DEA's incoherent and incorrect interpretations and applications of 21 C.F.R. §§ 1306.04(a) and 1306.06, as discussed herein.

### C.     The DEA Incorrectly Concluded that Neumann's Pharmacy Violated Louisiana State Law.

While the OSC charged Neumann's Pharmacy with failing "to comply with" certain "state law requirements," OSC at 2-3, the DEA placed little distinct emphasis on these regulations, instead bootstrapping them into its flawed §§ 1306.04(a) and 1306.06 analysis. A simple reading of these provisions would not support the DEA's conclusion that Neumann's Pharmacy violated any distinct requirements of Louisiana controlled-substances law.

Three Louisiana provisions restate the substance of § 1306.04(a) and § 1306.06.  *See* La. Admin Code tit. 46, Part LIII, § 2745(B)(1) (copying § 1306.04(a) nearly verbatim); *see also* § 2747(E)(2)(A) (similar); § 2747(A) (restating § 1306.06 in slightly different language).  The DEA did not suggest any substantive difference. Indeed, § 1306.04(a) is so substantively similar to La. Admin Code tit. 46, Part LIII, § 2745(B)(1) that the Louisiana State appellate court in *Tewelde v. Louisiana Bd. of Pharmacy* relied on this Court's analysis of § 1306.04(a) in *United States v. Hayes* to interpret a pharmacist's "corresponding responsibility" under the State administrative code. 2011-2244 (La. App. 1 Cir. 6/14/12), 93 So. 3d 801, 809, writ denied, 2012-1642 (La. 10/26/12), 99 So. 3d 652 (quoting *United States v. Hayes*, 595 F. 2d 258, 261 (5th Cir. 1979) ("What is required of [a pharmacist] is the responsibility not to fill an order that purports to be a prescription but is not a

33

prescription within the meaning of the statute because **he knows** that the issuing practitioner issued it outside the scope of medical practice.") (Emphasis added).

La. Admin Code, tit. 46, Pt. LIII, § 515 squarely addresses the issue of red flags and identifies certain "potential situations" that a pharmacist should be aware of and merely instructs the pharmacist to take "appropriate actions" based on "professional judgment." It does not require any documentation, nor does it specify what "actions" may be required as part of this "professional judgment" in any specific circumstance. (That makes sense, given the inherently individualized context in which pharmacists encounter these "situations" or any other "red flags," as discussed above.)

La. Admin Code, tit. 46, Pt. LIII, § 1123(L)(1) regulates the form of pharmacies' patient-profile records, as part of a broader and fairly detailed set of recordkeeping requirements set out in § 1123.[9] While subsection (L)(1) requires the dispensing pharmacist to "[ensure] that a reasonable effort has been made to obtain, document, and maintain" basic patient information—including, under subsection (L)(1)(vi), "the pharmacist's comments relevant to the individual patient's drug therapy, including any other necessary information unique to the specific patient or

---

[9] The DEA cited this Louisiana Administrative Code provision (with a "see also" signal) in connection with its conclusion that a "pharmacist must then document the resolution of the red flag on the hard copy prescription, in the pharmacy's computer system, or in a logbook." *Neumann's Pharmacy*, 90 Fed. Reg. at 8040. The provision says nothing of the kind.

drug"—it does not require a pharmacist to make particular "comments," nor does this provision specify what "information" is "necessary." Further, it makes no reference to La. Admin Code, tit. 46, Pt. LIII, § 515 and does not impose a specific documentation or record-keeping requirement for the red flags addressed by § 515.

A fundamental rule of statutory interpretation in Louisiana is that statutes which address specific instances govern those instances rather than statutes over broader, more general statutes. *Silver Dollar Liquor, Inc. v. Red River Par. Police Jury*, 2010-2776 (La. 9/7/11), 74 So. 3d 641, 648 ("…we note it is well-settled that when two statutes apply to the same situation, the specific statute prevails over the general one.") (quoting *Burge v. State*, 2010–2229 (La.2/11/11), 54 So.3d 1110, 1113). Applied here, the DEA cannot breathe into existence a new requirement for "red flags" by combining § 515, which specifically addresses "red flags," with another broader, more general administrative code provision regarding general record-keeping that makes no reference to § 515 or its subject matter.

> ### D. Neumann's Pharmacy Did Not Violate Any Law by Dispensing Dr. T.A. Neumann's Prescriptions.

The DEA found that Neumann's Pharmacy violated La. Admin Code, tit. 45, Part XLV, § 7603(A)(11) by dispensing the prescriptions for Ms. Neumann that were written by her father, Dr. T.A. Neumann. This regulation specifically provides an ethical rule for physicians:

[E]xcept in cases of emergency, physicians shall not prescribe controlled substances for themselves or their immediate family members. As respects a physician, immediate family members include the physician's spouse, children, parents, and siblings.

There is nothing in this regulation that would render the resulting prescription invalid. Nor does it speak to the duties of pharmacists in filling or not filling such a prescription. Rather, a violation merely would suggest potential "unprofessional conduct" on the part of the prescriber, Dr. Neumann, not the pharmacist. Furthermore, Ms. Neumann testified, and the DEA does not dispute, that Neumann's Pharmacy was unaware of this rather recent change in Louisiana's administrative code. Indeed, for approximately 20 years, Ms. Neumann had her prescriptions filled at another local pharmacy, whose pharmacist filled the prescription around eighty times and was equally unaware of this change in the law. Transcript at pp. 404-405, 411-412, 452-453, 460.[10] Furthermore, after learning that it was improper for her father to write her prescription, Ms. Neumann received her prescription from a physician in Delhi, Louisiana, which is approximately 20 miles from Tallulah. Transcript at p. 406. Thus, even if this provision regarding unprofessional conduct

---

[10] As Neumann's Pharmacy pointed out in its Post-Hearing Brief at p. 17 and Exceptions to Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision of the ALJ at p. 22 to the ALJ, this is not meant to shift blame to the other pharmacy in any manner or to suggest that the other pharmacist's potential ignorance absolves Ms. Neumann of her own responsibilities. Rather, this is merely to show that Ms. Neumann acted sincerely and in good faith—she simply was unaware that there was any legal or ethical issue with her father writing her prescriptions, and, when she became aware, she changed doctors.

for physicians were to render the prescription invalid, there was still no evidence that Neumann's Pharmacy *knowingly* filled an invalid prescription.

### III.    The DEA's Finding That Neumann's Pharmacy Did Not Address Red Flags Was Unsupported by Substantial Evidence and Was Arbitrary and Capricious

In addition to the DEA's pure legal errors, which by themselves are enough to reverse the determination below, the DEA's factual "findings" were not supported by substantial evidence. There was no basis for finding that Neumann's filled prescriptions for C.E., J.H.R., and S.W. without addressing or resolving their "red flags." At most, and as Neumann's Pharmacy explained in its Exceptions to the Administrative Law Judge's Report, the Government merely produced evidence that Neumann's Pharmacy failed to *document* the resolution of red flags. But failing to document something does not mean it did not happen. And there was no evidence whatsoever that Neumann's Pharmacy did not recognize the "red flags" DEA identified, that it did not fill the prescriptions in good faith, or that dispensing them was unreasonable given everything that was known. There was no evidence that the "red flags" at issue were so severe that they simply could not have been resolved from the information available. In fact, the unrebutted evidence showed that Neumann's Pharmacy had sound reasons to think all of the prescriptions were perfectly valid, and to fill them on that basis.

For C.E., for instance, Laura Neumann knew that he was experiencing cervical and shoulder issues based on her personal conversations with him. Transcript at pp. 443-445. Because of those conversations, she knew that C.E. was seeing specialists about his prolonged shoulder issues. Furthermore, some of the prescriptions were written by "M. Cain" who Neumann knew was a neurosurgeon. Transcript at p. 443. One of the prescriptions written by Dr. Cain was also issued through the Monroe Surgical Hospital. Transcript At p. 299. As Dr. Akers explained, this and other records in C.E.'s patient profile indicated that he had been diagnosed with left shoulder pain, had been prescribed non-steroidal anti-inflammatory ("NSAIDs") to attempt to manage the pain without opioids, and eventually underwent surgery. Transcript at pp. 290-293. Thus, C.E.'s explanation of his condition and treatment was corroborated by the prescription Neumann's Pharmacy received from Dr. Cain's office.

Regarding J.H.R., Neumann's Pharmacy knew that J.H.R. had been receiving a combination of hydrocodone with acetaminophen and alprazolam since about 2015, and she documented the resolution of this "red flag" at that time. Transcript at pp. 137-138. Neumann's Pharmacy also knew that J.H.R. was receiving this medication because of her temporomandibular joint (TMJ) disorder, which Neumann's Pharmacy understood to be a chronic and progressive condition. Thus,

as Dr. Akers testified, it would not be unreasonable for a patient such as J.H.R. to receive long-term opioid treatment for this condition. Transcript at pp. 364-365.

Furthermore, Neumann's Pharmacy introduced evidence showing that it routinely checked the J.H.R.'s Prescription Monitoring Program ("PMP") data prior to dispensing medications to her to ensure that she was not receiving duplicate medications from other pharmacies or providers. Transcript at p. 428; *see also* Respondent Ex. 8. These checks confirmed that J.H.R. was not abusing or diverting these medications or doctor shopping. Transcript at p. 332.

Finally, regarding J.H.R.'s use of cash payments, Neumann's Pharmacy knew that J.H.R. did not have insurance, because her insurance was rejected and because J.H.R. advised Ms. Neumann that she had lost her job. Transcript at p. 456. The Government never rebutted this evidence, nor did it introduce any evidence to show that J.H.R. had commercial insurance for the time frame at issue. In fact, Dr. Graham acknowledged that she failed to even look at the totality of J.H.R.'s records to determine if all her prescriptions, controlled and non-controlled, were paid with cash. Transcript at pp. 204-205. Furthermore, the Government did not investigate precisely how these payments were actually made, as Dr. Graham presumed that the indication of "copay" meant that an insurance plan was billed. Transcript at p. 203. As Dr. Akers explained (and Dr. Graham herself acknowledged), "copay" would

also have indicated when a cash discount card was used, as was the case with J.H.R. Transcript at p. 338; *see id.* at p. 204 ("they're both adjudicated the same way").

For S.W., Ms. Neumann testified that she spoke with the physician who prescribed S.W.'s medication, who indicated that he was continuing therapy which was originally prescribed to S.W. by specialists in California for severe migraine headaches. Tr. 336. Neumann's Pharmacy also specifically counseled S.W. on the potential dangers of exceeding certain dosage limits. Transcript at p. 419. Furthermore, the cash payments by S.W. were of no surprise to Neumann's Pharmacy: Ms. Neumann had known S.W. since childhood and knew that S.W. did not have American health insurance because she was living abroad. Transcript at pp. 412, 414-415. Finally, regarding "therapeutic duplication," Dr. Akers' expert testimony explained that the butalbital medications S.W. was taking for tension headaches could be taken alternatively, as one medication contained acetaminophen and the other contained aspirin; thus, the two medications were not actually duplicative. Transcript at p. 336. Furthermore, S.W.'s prescriptions were only filled every three-to-four months, which indicated that S.W. was not taking the medications simultaneously and was instead consistent with S.W. alternating prescriptions. Transcript at p. 335.

The Government produced no rebuttal evidence, and DEA did not find, as a factual matter, that these events did not happen. Instead, it categorically refused to

consider whether they had happened, solely based on the fact that Neumann's Pharmacy did not document them at the time (which, again, no statute, rule or regulation requires). The DEA held that "documentation is a critical component of addressing and resolving red flags," such that "a failure to document the resolution of a red flag *invalidates* any efforts to resolve [it]." *Neumann's Pharmacy*, 90 Fed. Reg. at 8,041, 8,044 n.23 (emphasis added). In effect, the DEA held that a pharmacist, by operation of law, is held to not have addressed a red flag unless the pharmacist shows on paper where it was addressed.

While the DEA ostensibly "credit[ed] Dr. Graham's testimony that, "if it's not documented, it wasn't done," *id.* at 8,041, this is obviously not a question of fact on which an expert opinion could be substantial evidence. As a basic matter of reality, the mere fact that an event is not documented does not mean it did not happen. If failing to document an event "invalidates" that event, such that it is deemed not to have occurred whether or not it actually did, that is a *legal* consequence.

The DEA's application of this invented rule, to find that Neumann's Pharmacy did not resolve the "red flags" for C.E., J.H.R., and S.W. without any inquiry into the historical facts and circumstances showing that dispensing those prescriptions was eminently reasonable, can only be described as arbitrary and capricious. As discussed, there simply is no statute, rule or regulation telling

pharmacists that every abstract "red flag" must be documented in any particular way. (Again, "red flag" *itself* is not even a defined legal term, but only shorthand for anything that might arouse a pharmacist's suspicions that a prescription could potentially be invalid.) Treating a failure to document the resolution of nominal "red flags" as conclusive proof that a pharmacist simply ignored "blatant red flags of drug abuse," *Neumann's Pharmacy*, 90 Fed. Reg. at 8,045, amounts to "entirely fail[ing] to consider" the significant (and, here, extensively narrated and unrebutted) possibility that the pharmacist may still have acted reasonably and filled the prescriptions with no reason to doubt that they were valid. *State Farm*, 463 U.S. at 43.

In short, the DEA has no substantial evidence that rebuts Neumann's Pharmacy's explanations to support dispensing of the subject prescriptions, and it was arbitrary and capricious for the DEA to disregard these explanations simply because they were not documented. The DEA had no basis to find that Neumann's Pharmacy dispensed any prescriptions which should not have been dispensed, and the DEA wholly failed to show that Neumann's Pharmacy *knowingly* dispensed an invalid prescription as required by § 1306.04(a).

### IV.    The DEA's Sanction Analysis Was Arbitrary and Capricious.

"Even if the agency's decision were sufficiently supported, the penalty imposed—which is the harshest of possible sanctions—would be unwarranted by law." *Morall v. DEA*, 412 F.3d 165, 181 (D.C. Cir. 2005).

The DEA repeatedly branded Neumann's Pharmacy's conduct as "egregious," but it was not, and *ipse dixit* cannot make it so. At the very most, the alleged misconduct that the DEA found and relied upon was: (1) For a small number of prescriptions for three patients, whose actual legitimacy is unchallenged and which are not claimed to have actually resulted in any abuse or diversion, Neumann's Pharmacy did not comply with a prophylactic documentation requirement that the DEA insists exists, despite its not being codified in any statute, rule or regulation; and (2) Neumann's Pharmacy twice filled Ms. Neumann's prescriptions from her father because she was unaware that the Louisiana administrative code regarding a physician's professional standards had recently changed. This is not *egregious* dispensing misconduct by any stretch of the word.

Moreover, the facts of the case the DEA relied upon  to support its finding of the egregiousness of Neumann's Pharmacy's alleged misconduct contrasts sharply with the instant matter. *See Neumann's Pharmacy*, 90 Fed. Reg. at 8046. In *Pharmacy Doctors Enterprises Inc., d.b.a. Zion Clinic Pharmacy*,  it was undisputed that the pharmacy in question failed to comply with State and Federal laws regarding

shipping controlled substances across state lines, and that it also failed to report certain controlled substances to Florida's electronic drug-monitoring system, as specifically required under Florida law. 789 Fed. App'x 724, 730, 732 (11th Cir. 2019). Furthermore, the medications and patients at issue were riddled with severe, glaring indicators of diversion: patients were driving hundreds of miles to the pharmacy to obtain prescriptions, prescriptions which were being re-filled well in advance of the time the patient would have exhausted the medication if taken as instructed, and prescriptions of the same drug were being written by the same doctor, on the same day, for individuals who shared a last name and address. *Id*. at 730.

These facts are obviously and easily distinguishable from the instant case. Here, there is no evidence (or finding) whatsoever that the prescriptions at issue were invalid or that the prescriptions were being abused or diverted. And the agency's finding that State and Federal laws were violated was based solely on the DEA's aggressive extension (really, as discussed above, redefinition) of Federal and Louisiana laws to treat failing to document how every abstract "red flag" was resolved as equivalent to knowingly dispensing invalid prescriptions and/or forsaking the practice of pharmacy to act as the equivalent of a drug dealer. By citing to *Pharmacy Doctors* to support its finding of "egregious" misconduct here without conducting any meaningful analysis comparing or contrasting the facts of these cases, the DEA has shown that there is no coherent basis for its determination of

44

"egregiousness." Instead, the DEA's position suggests that it is free to simply label any alleged misconduct as "egregious" without the need of any actual analysis, much less a discernible standard by which to measure "egregiousness."

The DEA refused to even entertain that Neumann's Pharmacy's alleged misconduct was not so egregious as to warrant revocation, considering its limited scope and largely procedural character (i.e., this was not a case involving a "pusher" pharmacist filling patently, facially invalid prescriptions for highly addictive substances). In response to Neumann's Pharmacy's arguments on this issue, the DEA offered only deflections—insisting that its harshest sanction was *warranted* simply because nothing specifically *prohibited* it. *See Neumann's Pharmacy*, 90 Fed. Reg. at 8046 n.27 (insisting that none of "actual diversion, harm to patients," "gross negligence," and "intentional" misconduct—all missing here—is individually "necessary" to revocation); *id.* at 8048 (refusing to consider that conduct in question was less egregious than in *Heavenly Care Pharmacy*, 85 Fed. Reg. 53,402 (2020)).

That is not a reasoned exercise of discretion considering all relevant factors. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) ("…an agency must cogently explain why it has exercised its discretion in a given manner."). Simply stating that the law permits the DEA to levy its harshest sanction falls far short of any cogent explanation. This Court would

certainly find that a district court abused its sentencing discretion if, in imposing the maximum sentence allowed by statute for offense conduct that was objectively relatively innocuous, it reasoned only that it was legally empowered to do so. That is, in essence, the DEA's justification here.

It was also arbitrary and capricious for the DEA to completely disregard that Neumann's Pharmacy operates in a medically underserved area. *See* ALJ Opinion at 41 n.40, *adopted at Neumann's Pharmacy*, 90 Fed. Reg. at 8,039. Under the governing statute, the *ultimate* finding necessary to revoke a COR is that the respondent's continued registration would be "inconsistent with the public interest." 21 U.S.C. § 824(a)(4). Genuine consideration of the public interest plainly would require the DEA to ask whether the limited, largely procedural misconduct found here so outweighs the value of Neumann's Pharmacy's service to its community that revocation is warranted.

## V.     The DEA's Requirement of "Unequivocal Acceptance of Responsibility" is Arbitrary and Capricious and Violates Due Process.

The DEA not only disregarded Neumann's Pharmacy's suggestion that the alleged misconduct was insufficient to justify its most severe sanction; it actively faulted Neumann's Pharmacy for defending itself. *See Neumann's Pharmacy, LLC; Decision and Order*, 90 FR 8039-01, 8044 ("Ms. Neumann also made statements that minimized Respondent's misconduct…Ms. Neumann argues that Respondent's

mistakes were "inadvertent," and that she believed "in good faith" that the prescriptions were valid.").

The DEA incorrectly found that Ms. Neumann attempted to "minimize the egregiousness of [Neumann's Pharmacy's] misconduct" by stating that the mistakes she made were inadvertent ones made in good faith, and for denying that she failed to address and resolve red flags. *See Neumann's Pharmacy, LLC*, 90 FR at 8044-45, n. 23, 25 ; *see also* ALJ Opinion at p. 36. The DEA also faulted Ms. Neumann for "attempt[ing] to shift blame" to the DEA by pointing out the lack of specific controlling laws regarding "red flags" and "corresponding responsibility." *See Neumann's Pharmacy, LLC*, 90 FR at 8045.

In essence, the DEA's position is that nothing short of full admission of wrongdoing on all counts would satisfy this standard and that any argument that the DEA improperly construed and applied the controlling regulations, such as eliminating the *mens rea* requirement from 21 C.F.R. § 1306.04(a), or pointing out that the DEA had no rule requiring documentation of red flag resolutions, demonstrated a failure to "unequivocally accept responsibility." Ultimately, the DEA used this alleged failure to "unequivocally accept responsibility" as the sole justification to take a minor infraction and leapfrog over lesser, more measured sanctions to levy the most draconian discipline at its disposal, revocation. *Id.*

The DEA's creation and use of "unequivocal acceptance of responsibility" as a determinative factor in sanctioning Neumann's Pharmacy was arbitrary, capricious, and in violation of the agency's own rules and regulations. Nowhere in the CSA or its codified rules and regulations is there a requirement that a registrant not defend itself at a DEA show cause hearing and unequivocally accept responsibility in order to avoid a more severe sanction. Rather, the DEA has created this standard through internal adjudications, not through any lawful rulemaking.

Even assuming the DEA may consider acceptance of responsibility as one factor in its sanction analysis, it must apply that consideration rationally and in a manner tethered to culpability. Yet here, the DEA applied the standard not to evaluate Neumann's Pharmacy's good or bad faith, but to convert otherwise technical or minor infractions—such as failure to document discretionary judgments—into grounds for the harshest available sanction. In essence, the agency weaponized Neumann's Pharmacy's defense to the allegations as evidence of unfitness, rather than evaluating whether the underlying conduct itself warranted revocation.

This application of the DEA's "unequivocal acceptance of responsibility" standard is also wholly incompatible with the fundamental right of Due Process. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319,

333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). As a registered pharmacy under the CSA, Neumann's Pharmacy's right of due process is enshrined in 21 C.F.R. § 1316.47, which entitles the pharmacy to an administrative hearing— one which is inherently adversarial and, therefore, entitles Neumann's Pharmacy to present evidence on its behalf, argue ambiguity in relevant rules, and generally present a defense.

Moreover, Neumann's Pharmacy *did* acknowledge and accept responsibility for not documenting the resolution of red flags and for filling Ms. Neumann's prescriptions from Dr. Neumann—which are the only "violations" that the Government actually proved. The DEA simply faulted Neumann's Pharmacy for failing to unequivocally accept responsibility for other matters which the Government did not prove—in particular, Neumann's Pharmacy was penalized for not agreeing that its conceded documentation failures retroactively nullified its actual knowledge and inquiries about C.E., J.H.R., and S.W., which dispelled any possible concerns from the abstract "red flags." This suggests that a registrant's only course of action to satisfy the DEA is to fully and wholly admit wrongdoing once the DEA has issued an OSC, regardless of the sufficiency of the evidence the Government has or can put forth, lest said registrant be faulted for pointing out any shortcomings in the Government's case.

## VI.    The DEA's Legal and Factual Errors Warrant Vacatur Without Remand.

The APA requires "set[ting] aside" wrongful agency action, such that "the default rule is that vacatur is the appropriate remedy." *Chamber of Com. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023). The usual next step "is to remand to the agency for additional investigation or explanation." *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002). "Remand without vacatur of the agency action is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) (internal quotations omitted).

In this case, however, there is nothing to remand. The legal and factual errors discussed above permeate the DEA's order, such that "[t]here is no possibility that [the agency] could obviate [them] on remand." *Id*. Rejecting those errors means destroying the entire theory of this revocation proceeding.

However, should this Court determine that it should remand this matter back to the DEA, this Court should also clearly instruct the DEA as to the findings the DEA would have to make to support violations of § 1306.04(a) and § 1306.06. For the former, the DEA must find that Neumann's Pharmacy dispensed prescriptions with actual knowledge or willful blindness that they were invalid.  For the latter, it must find that Neumann's Pharmacy was not pursuing pharmacy practice at all and

was instead engaged in the mere sham of professional practice and acting as a "pusher."

## CONCLUSION

For the foregoing reasons, the DEA's decision should be vacated without remand.

July 22, 2025                          SUBMITTED BY:

*/s/Adam R. Karamanis*
Michael L. DuBos (La. Bar No. 23944)
Adam R. Karamanis (La. Bar No. 39544)
Breithaupt, DuBos & Wolleson, L.L.C.
1811 Tower Drive
Monroe, LA 71201

William P. Gibbens (La. Bar. No. 27225)
Schonekas, Evans, McGoey, &
McEachin, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, LA 70112

*Counsel for Petitioner Neumann's Pharmacy, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2025, the foregoing document was served on all counsel of record by CM/ECF.

Dated: July 22, 2025

<div align="right">

<u>*/s/Adam R. Karamanis*</u>
Adam R. Karamanis
*Counsel for Petitioner*
*Neumann's Pharmacy, L.L.C.*

</div>

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1, this document contains 11,721 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2505 Build 16.0.18827.20102) in 14-point font size in Times New Roman type style.

Dated: July 22, 2025

*/s/Adam R. Karamanis*
Adam R. Karamanis
*Counsel for Petitioner*
*Neumann's Pharmacy, L.L.C.*